IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 2, 2023

**IN RE GRACE F., ET AL.**

**Appeal from the Juvenile Court for White County**
**No. JV-2063, 5142  John Meadows, Judge**
_____

**No. M2023-00344-COA-R3-PT**
_____

This appeal concerns a petition to terminate the parental rights of a mother and a putative father. The trial court found by clear and convincing evidence that several grounds for termination had been proven and that termination was in the best interest of the children. The mother and putative father appeal. On appeal, the Department of Children's Services concedes some of the grounds that the trial court concluded were established. However, DCS maintains that five grounds for termination were sufficiently proven against the mother and that three grounds along with the putative father grounds were sufficiently proven against the father. We conclude that these remaining grounds for termination were sufficiently proven, and we conclude that termination was in the best interest of the children. We reverse in part, with respect to one ground for termination of mother's parental rights and three grounds for termination of the putative father's parental rights, but otherwise we affirm the trial court's order terminating parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in
Part, Reversed in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and W. NEAL MCBRAYER, JJ., joined.

J. Brad Hannah, Smithville, Tennessee, for the appellant, Whitney F.

J. Patrick Hayes, Cookeville, Tennessee, for the appellant, Ted H.

Jonathan Skrmetti, Attorney General and Reporter, and Katherine P. Adams, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

# I. FACTS & PROCEDURAL HISTORY

This appeal concerns the parental rights of Whitney F. to two of her children, Grace and Ransom, and the parental rights of Ted H. to Ransom.[1] When the children were born, Whitney was married to another individual, but there was no father listed on the birth certificate of Grace or Ransom. Genetic testing established that Whitney's former husband is not the biological father of either child, and he executed a denial of paternity for both children. It was later established through genetic testing that Ted is the biological father of Ransom but not of Grace.

In September 2020, prior to the birth of Ransom, the Department of Children's Services ("DCS") received a report alleging inappropriate supervision and drug exposure as to Grace and three other siblings, perpetuated by Whitney and Ted. The report specifically alleged that Whitney and Ted had left the children in the care of two known drug users. A DCS case manager went to the home and observed that the two known drug abusers along with Ted's father were in a camper next to Whitney and Ted's home. Although there were two cars in the driveway, Ted's father reported that Whitney and Ted were not at home. The case manager returned to the home later accompanied by law enforcement and probation officers. This time, one of the residents of the nearby camper reported that she had access to the home and admitted that there were drugs in the home and in the camper where she stayed. She further stated that she babysat the children. Then, law enforcement and probation officers searched the camper and found methamphetamine, syringes, spoons, and other drug paraphernalia. Whitney and Ted then exited the home with one-year-old Grace. Ted appeared to be under the influence because his eyes were bloodshot, his pupils were constricted, and his speech was slurred. Ted admitted to having used methamphetamine in the past few days, and he further admitted that he had illegally used suboxone. Whitney reported that she was four months pregnant and admitted to having used methamphetamine two weeks earlier. Whitney further admitted to using drugs with Ted and that she knew about the other adults on the property using drugs. After Whitney entered the home, despite instruction not to do so, the case manager became concerned that she was trying to hide something. Law enforcement then entered the home and found needle caps, marijuana, a glass pipe, and resale bags. All adults were issued a citation. Ted then completed a drug test and tested positive for amphetamine, methamphetamine, suboxone, and MDMA. Whitney was also tested and was negative for all panels used. The home was not clean, and it had little food and no running water. Grace had only a few diapers. The pool next to the home was filled with burning trash. Whitney reported that she had been to a domestic violence shelter three weeks earlier, but she denied that Ted had been abusive to her. According to Whitney, she lied to the shelter and wanted to leave the home for a few days.

---

[1] In order to protect the privacy of the children involved, it is this Court's policy to use the first names and initials of the parties and children.

In September 2020, DCS filed a petition to declare Grace and her siblings dependent and neglected. The juvenile court subsequently issued attachments pro corpus and protective custody orders placing Grace in the protective custody of DCS and placing her siblings with Whitney's former husband. After it was established by DNA testing that Ted was not the biological father of Grace, he was dismissed. In April 2021, after a hearing, the juvenile court found that the State had proven by clear and convincing evidence that Grace and her siblings were dependent and neglected and that it was in the best interest of these children for custody of Grace to remain with DCS and custody of the siblings to remain with Whitney's former husband.

Ransom was born in March 2021. DCS received a report concerning Ransom alleging prenatal drug use by his mother, Whitney. A DCS case manager spoke with a hospital social worker who reported that Whitney and Ransom were being discharged after Whitney and the child tested negative for illegal drugs. The case manager subsequently attempted to conduct a home visit. The case manager later contacted Whitney and reminded her that the case manager would need to visit the child. Whitney replied that she did not have to meet with her and that she was aware of a child and family team meeting which she would attend by phone. After the case manager explained that DCS needed to observe the child, and if not allowed to, would seek court action, Whitney replied that she was in Cookeville and would meet the case manager in public. The case manager then requested that Whitney submit to a drug test, but Whitney refused to do so without a court order and further reported that she had submitted to a hair follicle drug test about four months earlier, of which the case manager found no record. Whitney stated that she would not allow the case manager to complete a home visit without a court order. DCS then filed a petition to declare Ransom dependent and neglected and sought an immediate protective custody order. The juvenile court subsequently issued an attachment pro corpus and protective custody order placing Ransom in the protective custody of DCS. In June 2021, the court found that DCS had proven by clear and convincing evidence that Ransom was dependent and neglected and that it was in Ransom's best interest for custody to remain with DCS.

DCS developed the first permanency plan in March 2021, which was subsequently ratified by the juvenile court. The statement of responsibilities for both Whitney and Ted required them to obtain and maintain safe and stable housing free of safety hazards. The plan also required them to obtain income to support themselves and the children and provide proof of employment to DCS. Additionally, due to concerns about prior reports of domestic violence, they were required to successfully complete a domestic violence education program with an approved provider. To maintain a bonded relationship with the children, the plan also provided for scheduled visitation with a responsibility to attend all scheduled visits and arrive on time, with a confirmation of each visit at least twenty-four hours in advance. Whitney and Ted were also required to successfully complete parenting education with an approved provider. Because of their history with substance

abuse, the plan further required them to obtain an alcohol and drug ("A&D") assessment and follow all recommendations. Whitney and Ted were also to submit to random drug screens and maintain sobriety and a drug free lifestyle for a minimum of six months. Because of their criminal history and pending charges, the plan required Whitney and Ted to resolve their pending legal charges and not obtain any new charges. Due to mental health concerns, they were required to complete psychological evaluations. The statement of responsibilities for Ted included an additional responsibility of completing DNA testing for Ransom due to Ted's status as a putative father. Over the course of DCS's involvement with the family, three other permanency plans were developed in September 2021, March 2022, and September 2022. These plans were ratified by the juvenile court. The responsibilities in these permanency plans remained substantially the same.

In March 2022, DCS filed a petition for the termination of Whitney's parental rights to the children and for the termination of Ted's parental rights to Ransom. DCS alleged that six grounds for termination existed as to Whitney and Ted: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) abandonment by failure to establish a suitable home; (4) substantial noncompliance with a permanency plan; (5) persistent conditions; and (6) failure to manifest an ability or willingness to assume custody or financial responsibility. DCS alleged additional grounds as to Ted for abandonment by wanton disregard and putative father grounds under Tennessee Code Annotated section 36-1-113(g)(9).[2] DCS further alleged that it was in the best interest of the children for the parental rights of Whitney and Ted to be terminated. A trial on the petition was held in December 2022.

The trial court first heard testimony from Julie Brown, a family services worker with DCS. Ms. Brown testified that Whitney was not incarcerated in the four months preceding the filing of the petition and that Whitney did not pay child support in this period. She further stated that Whitney is not disabled and was aware of her duty to support the children because it was discussed in the dependency and neglect proceedings as well as in the permanency plan meetings. Ms. Brown explained that at one time, Whitney reported that she was employed to do housekeeping at a hotel. Ms. Brown stated that Whitney had not provided DCS with any excuse for not paying child support. Both Ted and Whitney had vehicles, and Ms. Brown further stated that they had tested positive for methamphetamine, so they must have money available to purchase drugs. Ms. Brown further testified that Whitney and Ted did not regularly visit the children, and during the four months preceding the filing of the petition, Whitney only visited once in November 2021. For this visit, Whitney was forty-five minutes late to the visitation. Ms. Brown further stated that both Whitney and Ted were aware of their duty to regularly visit the

---

[2] In the petition, DCS alleged all of the additional grounds for termination of putative father's parental rights listed in Tennessee Code Annotated section 36-1-113(g)(9), but these allegations were listed under the heading entitled "Failure to Establish Parentage." However, it is clear from the petition that DCS was alleging each ground applicable to putative fathers in this statute.

children as it was discussed in every permanency plan as well as every child and family team meeting. Ms. Brown also testified that Whitney had the ability to visit as DCS offered transportation and scheduled visitation around her schedule.

Ms. Brown explained that the concerns that led to the removal were the drug users in and out of the home and the cleanliness of the home. Ms. Brown visited the home in March 2022 and noticed that the home was very cluttered with car parts on the floor, a large bottle of liquor on the floor, a sandwich bag with white pills that Ted said were ibuprofen, and pill bottles in the living area with other people's names on them. Ms. Brown stated that the home was in the same situation in March 2022 that it was when the children were removed. She also expressed concern about Whitney and Ted's continued use of methamphetamine and amphetamine.

Ms. Brown further testified that Whitney had not completed any of the permanency plan requirements. She said Whitney had several opportunities to go into inpatient drug rehab centers but she did not engage in any of them. DCS offered transportation for her on two separate occasions, but Whitney refused it. Whitney continued to use illegal substances and appeared to be under the influence during visitation with the children. Whitney also had underlying mental health conditions that were never treated. Ms. Brown stated that Whitney did not follow through with any of the recommendations on the permanency plan regarding parenting, domestic violence counseling, or obtaining and maintaining employment. She also explained that Ted did not do anything on the permanency plans. He did not complete an A&D assessment, did not do anything in regards to his mental health or parenting, and he did not obtain employment. He would also come to visitation smelling like alcohol.

Ms. Brown also testified concerning the reasonable efforts by DCS regarding the parents and the children. The requirements of the permanency plans and criteria and procedure for termination of parental rights were all explained to Ted and Whitney. DCS provided Whitney and Ted a list of service providers along with assistance in scheduling appointments with providers. Ms. Brown stated that she submitted requests for financial resources through DCS for help in obtaining services for Ted since he did not have insurance. DCS also offered assistance with transportation for Whitney and Ted to go to and from appointments with service providers. Ms. Brown felt she had gone above and beyond the reasonable efforts required of her. She stated that neither Whitney nor Ted had completed any services offered by DCS and providers to resolve any of the conditions that led to removal. She stated that both parents failed to visit the children on a regular basis, continued to engage in criminal activity, continued to use illegal drugs, failed to seek treatment for mental health or parenting concerns, and failed to have a stable income to support the children. She further testified that the children would suffer further abuse if they are returned to the care of the parents. Ms. Brown stated that Whitney and Ted will likely not remedy their conditions because they have had every opportunity to follow their plan and make improvements but failed to do so.

Ms. Brown then expressed that the children have strong bonds with their foster parents and are attending day care and necessary medical appointments regularly. She recalled a time when she went to pick up the children from the foster parents' home to transport them to visitation, and she "literally had to peel them off the foster parents crying." Ms. Brown then concluded by stating that the children deserve stability and permanency, and Whitney and Ted are not able to provide them that but the foster parents can. Ms. Brown ultimately stated that it was in the best interest of the children for the parental rights of Whitney and Ted to be terminated.

On cross-examination, Ms. Brown stated that Ted was doing odd jobs during the proceedings, and Ted reported that he was rebuilding carburetors in his home. Ms. Brown then testified that she assumes that Ted had money because he bought drugs. She stated that she did not know if Ted was working, but there was nothing preventing him from working. Ms. Brown further testified that Ted had participated in the parenting classes, but she never got a certificate of completion. Ms. Brown noted that she did not know how many drug screens Ted had passed before she received the case, but she did know that Ted had submitted to a urine drug screen at a visitation in May 2022 and had tested positive for methamphetamine and amphetamine. Ted also submitted to a court-ordered hair follicle test and was positive for methamphetamine and amphetamine. Ms. Brown also stated that visitation had been cancelled a few times because Whitney and Ted failed to confirm the visit twenty-four hours prior as a court order required. DCS also assisted Whitney in attending visitation by paying for gas money and assisting her in remedying battery problems with her car. During supervised visits, Whitney was in and out of the visitation, but she did play with the children. Though DCS offered transportation to Whitney for visitation, there were three occasions where DCS could not complete a request for transportation. Whitney brought food, toys, and clothes for the children to visitation. Ms. Brown also stated that Whitney had employment when she was pregnant with her latest child during part of the case, and this may have affected her ability to work; however, Whitney had reported employment at a laundry department at a hotel.

The court then heard testimony from the pre-adoptive foster mother of the children. Grace had been in her home for three years, and Ransom had been in her home since he was ten days old. She testified that she had observed the children interact with each other, and they love each other. She stated that she has established a strong bond with the children, and the children have a strong bond with her. The children also call her and her husband, "mom" and "daddy." The foster mother further testified that the children are now well-adjusted in her home and that they are happy and healthy. She also stated that when Grace comes back home from visitation, she is disruptive and acts out of character, but when she does not visit, she is happy, healthy, and well-adjusted. The foster mother then concluded her testimony by asking the court to consider the children's well-being, health, and upbringing in a well-adjusted home to be a priority.

Ted also testified. He stated that he participated in a parenting class but he did not receive a certificate because DCS claimed that he did not follow procedure in completing an A&D assessment first. He said he had made appointments to do the A&D assessment, but he did not complete it because he missed the appointments due to transportation issues or issues with his phone. Ted stated that he could not complete the A&D assessment because he did not understand that he had to go to a place of DCS's choosing to complete it. Ted stated that he now is employed with a stable job, and he believed that he was in a better position to complete the program due to his current employment.

Whitney also testified at trial. She stated that she had completed her parenting class twice, did several A&D assessments, and passed a drug screen when the case first opened. She further said that she tried to get help with finding a domestic violence class, but it was not made available to her. She testified to having mental health problems throughout the case, with depression when the case was opened and severe postpartum depression after two pregnancies. Though she had a psychological evaluation scheduled, she was not able to complete her mental health treatment because she missed the appointments. Regarding visitation, Whitney stated that she had visited as many times as she could, the visits went well, and she felt that she has bonded with the children. She had reached out for transportation on several occasions due to issues with her car, but she had recently acquired another vehicle that runs. However, she is still not able to go to Davidson County for visitation. Whitney recalled a time when DCS offered her transportation to a visit with the children at a restaurant, but she never received any follow up message until the time of the visit, when a DCS worker texted her, "Are you not going to be at the visit?" Later, upon cross-examination, it was revealed that she may have been confused about that visit, and she cancelled that visit because she was sick. She further testified that DCS scheduled another visit knowing that she could not make it, and after she requested transportation, she never heard back.

Whitney testified that she had been on medication for mental health issues for the past two and a half months, and she had gone to counseling while the case was pending. She also testified that she continued to use drugs while she was pregnant, and she was still combatting the addiction and had relapsed a month ago after someone offered her methamphetamine. Although she was not working a steady job at the time of trial, she stated that she had a job interview for a position that would pay nineteen dollars an hour. She had worked side jobs where she cleaned houses, making about forty to forty-five dollars per house, which amounted to $120 to $140 per week. Her regular expenses included about one hundred dollars per month on utilities and about twelve dollars a month on cigarettes. She also testified that she was paying automobile insurance. Although her testimony was not clear, it appeared that she was claiming that she was paying $62 three times a year. She also stated that she was going to start paying child support, and she was capable of making nineteen dollars per hour.

In January 2023, the trial court orally announced its findings of fact and

conclusions of law, which were later reduced to writing. In February 2023, the court entered a written order terminating the parental rights of both Whitney and Ted. The court found that DCS had established the following grounds for the termination of the parental rights of both Whitney and Ted: (1) abandonment by failure to support; (2) abandonment by failure to visit; (3) abandonment by failure to establish a suitable home (4) substantial noncompliance; (5) persistent conditions; and (6) failure to manifest a willingness and ability [to assume custody and financial responsibility]. The court also found that Ted was the putative father of Ransom and that DCS had established the grounds for termination of Ted's parental rights under Tennessee Code Annotated section 36-1-113(g)(9).[3] However, the court found that DCS failed to meet its burden of proof with respect to abandonment by wanton disregard as to Ted. Additionally, the court found that termination was in the best interests of the children. Whitney and Ted subsequently appealed.

## II. ISSUES PRESENTED

Whitney presents the following issues for review on appeal, which we have slightly restated:

1. Whether the trial court erred in finding that DCS proved the ground of abandonment by clear and convincing evidence;
2. Whether the trial court erred in finding that DCS proved the ground of substantial noncompliance with the permanency plan by clear and convincing evidence;
3. Whether the trial court erred in finding that DCS proved the ground of persistent conditions by clear and convincing evidence;
4. Whether the trial court erred in finding that DCS proved the ground of failure to manifest an ability and willingness to assume custody by clear and convincing evidence;
5. Whether the trial erred in finding that DCS proved that termination of the appellant's parental rights is in the best interest of the minor children.

Ted presents the following issue for review on appeal, which we have slightly restated:

1. Whether the trial court erred when it determined that it was in the best interest of the child to terminate Ted's parental rights.

Although Ted does not present any issue regarding the grounds for termination of

---

[3] Like the petition, the trial court's order also listed findings on the grounds for termination of putative father's parental rights listed in Tennessee Code Annotated section 36-1-113(g)(9) under the heading entitled "Failure to Establish Parentage." It is also clear that the trial court made a finding and ruled on each ground within the statute.

his parental rights, we must review the trial court's decision as to grounds as well. *See In re Carrington H.*, 483 S.W.3d 507, 511 (Tenn. 2016) (holding that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenges these findings on appeal"). We note, however, that DCS states in its brief on appeal that "DCS concedes the grounds of abandonment by failure to support and abandonment by failure to visit as to [Ted] only, and abandonment by failure to establish a suitable home as to [Whitney] and [Ted]." We therefore reverse the trial court's findings as to these grounds. *See In re Jaylan J.*, No. W2019-02025-COA-R3-PT, 2020 WL 7861378, at *12 (Tenn. Ct. App. Dec. 22, 2020); *In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *6 (Tenn. Ct. App. Oct. 29, 2018) *perm. app. denied* (Tenn. Jan. 22, 2019) ("[W]hen the petitioner who sought termination has conceded on appeal that a ground was not sufficiently proven, this Court has, in several cases, reversed the trial court's finding as to that ground without reaching the merits of whether the ground was actually established."); *In re Zane W.*, No. E2016-02224-COA-R3-PT, 2017 WL 2875924, at *7 (Tenn. Ct. App. July 6, 2017) *perm. app. denied* (Tenn. Sept. 26. 2017) (reversing a ground that DCS "does not defend" and noting that *Carrington* "has never been construed to require this Court to also consider the grounds sustained by the trial court and thereafter conceded or waived by the non-parent on appeal"). DCS defends only the grounds of abandonment by failure to support, abandonment by failure to visit, substantial noncompliance, persistent conditions, and failure to manifest a willingness and ability to assume custody against Whitney and the grounds of substantial noncompliance, persistent conditions, failure to manifest a willingness and ability to assume custody, and the five additional putative father grounds of Tennessee Code Annotated section 36-1-113(g)(9) against Ted. We therefore proceed to consider these issues.

## III.   STANDARDS APPLICABLE TO TERMINATION CASES

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination as provided in section 36-1-113(g). *Id.* The grounds are "cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground[.]" Tenn. Code Ann. § 36-1-113(g). Second, the petitioner must prove that termination of parental rights is in the best interest of the child under the factors set forth in section 36-1-113(i). *In re Kaliyah S.*, 455 S.W.3d at 552.

Because of the constitutional dimension of the rights at stake, the petitioner seeking termination "must prove both elements by clear and convincing evidence." *In re Khloe O.*, M2021-01125-COA-R3-PT, 2022 WL 2164288, at *3 (Tenn. Ct. App. June 16, 2022) (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)); *see* Tenn. Code Ann. § 36-

1-113(c).  "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]"  *In re Bernard T.*, 319 S.W.3d at 596 (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)).  It also "eliminates any serious or substantial doubt about the correctness of these factual findings."  *Id.* (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

Due to the heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal.  *In re Audrey S.*, 182 S.W.3d at 861.  We review the trial court's factual findings de novo in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure and presume each factual finding to be correct unless the evidence preponderates otherwise.  *In re Carrington H.*, 483 S.W.3d at 524.  We then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights."  *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97).  "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness."  *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV.    DISCUSSION

### A.    *Grounds for Termination*

### 1.    **Abandonment as to Whitney**

This ground exists when a parent has abandoned his or her child, as defined in Tennessee Code Annotated section 36-1-102(1)(A).  Tenn. Code Ann. § 36-1-113(g)(1).[4]  Within section 36-1-102(1)(A) are "five alternative definitions for abandonment as a ground for the termination of parental rights."  *In re Ciara O.*, No. E2022-01179-COA-R3-PT, 2023 WL 3337215, at *4 (Tenn. Ct. App. May 10, 2023) (citing *In re Audrey S.*, 182 S.W.3d at 863)).  The relevant definition for purposes of this appeal provides that abandonment occurs when:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent . . . either have

---

[4] Since the filing of the petition to terminate parental rights, the termination statute has been amended.  All quotes and references to the termination statute in this opinion are to the version of the statute in effect when the petition was filed in March 2022.  *See In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023) ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed.").

failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i).[5]

### a.    Failure to Support

The statute defines failure to support as the failure "to provide monetary support" or "to provide more than token payments toward the support of the child."  Tenn. Code Ann. § 36-1-102(1)(D).  "Token support" is support that "under the circumstances of the individual case, is insignificant given the parent's means[.]"  Tenn. Code Ann. § 36-1-102(1)(B).  The determinative time period for this ground as to Whitney, counting back four months from when the petition was filed on March 1, 2022, was from October 28, 2021 to February 28, 2022.  In July 2021, the trial court had ordered Whitney to pay $50.00 monthly for each child, totaling $100.00 per month in required child support payments.  However, Ms. Brown testified that the only financial support Whitney paid was a single payment of approximately $23.00 for Grace in November 2021, which was confirmed by a print-out from the Child Support Enforcement Services database.  Thus, Whitney paid little monetary child support for Grace and no support for Ransom during the relevant four-month period.  Though we recognize that Whitney contributed some necessary items such as food, gifts, and clothing to the children, the monetary support that Whitney paid is no more than token support when compared to the amount that she was supposed to pay during the four-month period and her ability to earn income during this period.  Though her employment during this period was not stable, she was not disabled and was capable of working.  Therefore, the trial court correctly found that there was clear and convincing evidence supporting this ground as to Whitney.

### b.    Failure to Visit

Tennessee Code Annotated section 36-1-102(1)(A)(i) further provides a definition of abandonment for when the parent has "failed to visit" within the "period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent."  Failure to visit is further defined as "the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). "Token visitation" is defined as visitation that "under the circumstances of the individual case,

---

[5] A parent may raise the affirmative defense of absence of willfulness.  Tenn. Code Ann. § 36-1-102(1)(I).  Here, however, Whitney did not raise this affirmative defense in an answer to the petition.  Consequently, she waived that affirmative defense.  *See* Tenn. R. Civ. P. 12.08 (specifying that affirmative defenses not raised by motion or answer are waived).  Additionally, Whitney did not raise the issue at trial.  Therefore, the defense of willfulness was not tried by implied consent.  *See McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997) ("Implied consent hinges on the issues that were actually litigated by the parties . . . .").

constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(1)(C).

The trial court found that Whitney had failed to engage in more than token visitation during the four-month period preceding the filing of the petition to terminate parental rights, October 28, 2021 to February 28, 2022. Specifically, the trial court noted that Whitney had attended one hour and fifteen minutes of one scheduled two-hour visit but had missed one two-hour scheduled visit and three four-hour scheduled visits. The record supports these findings. On appeal, Whitney argues that there was not clear and convincing evidence to prove this ground because she did visit within the four-month period and there was no evidence presented as to what happened at the visit between the child and her. Nevertheless, of sixteen hours scheduled during this four-month period, Whitney only attended one hour and fifteen minutes of visitation. Furthermore, Ms. Brown testified that she did not have a reasonable expectation that Whitney will create a secure and healthy relationship with the children due to her lack of visitation. Such visitation is token in that it does nothing more than establish "minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(1)(C). Therefore, we affirm this ground for termination of Whitney's parental rights to the children.

### 2. Substantial Noncompliance with the Permanency Plan

Tennessee Code Annotated section 36-1-113(g)(2) provides one ground for a parent's rights to be terminated if "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." The permanency plan requirements must be "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d at 547. Not every failure to comply with a requirement in a permanency plan will constitute grounds for termination of parental rights. *In re Jaylan J.*, No. W2019-02025-COA-R3-PT, 2020 WL 7861378, at *14 (Tenn. Ct. App. Dec. 22, 2020) (citing *In re Abigail F.K.*, No E2012-00016-COA-R3-JV, 2012 WL 4038526, at *14 (Tenn. Ct. App. September 14, 2012)). Instead, the noncompliance with the permanency plan "must be *substantial*." *Id.* (quoting *In re Valentine*, 79 S.W.3d at 548). Thus, "[t]rivial, minor, or technical deviations" do not rise to the level of substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004).

The children were placed in DCS custody due to lack of and/or inappropriate supervision, drug exposure, insufficient housing, and domestic violence. The responsibilities on the permanency plans were devised with the aim of correcting these issues by aiding Whitney and Ted in creating a safe, clean, and drug-free home for the children and in developing a strong family relationship. Although this ground does not require a parent to comply with every jot or tittle of the statement of responsibilities in the permanency plan in order to preserve their parental rights, *In re Ronon G.*, No. M2019-

01086-COA-R3-PT, 2020 WL 249220, at *8 (Tenn. Ct. App. Jan. 16, 2020), the record supports a finding that neither Whitney nor Ted successfully completed the majority of their responsibilities. Although Whitney testified that she had completed an A&D assessment, she did not submit any paperwork to corroborate this claim. Likewise, Whitney did not complete domestic violence classes. She also did not successfully obtain any sufficient and regular income or obtain a *safe* home for the children. Whitney further failed to maintain sobriety. Although Whitney had visited the children, the visitation was sporadic in frequency and cut short. Ted, as well, failed to complete any of his responsibilities except for undergoing DNA testing. Therefore, we conclude that there is clear and convincing evidence to support this ground as to Whitney and Ted.

### 3. Persistent Conditions

We next address whether the trial court erred in finding clear and convincing evidence to support the ground of persistent conditions. This ground applies when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each element must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550. This Court has explained that "[t]he necessary order of removal is 'the threshold consideration' for this ground." *In re Lucas S.*, No. M2019-01969-COA-R3-PT, 2021 WL 710841, at *4 (Tenn. Ct. App. Feb. 24, 2021) (quoting *In re Alleyanna C.*, No. E2014-02343-COA-R3-PT, 2015 WL 4773313, at

- 13 -

*14 (Tenn. Ct. App. Aug. 10, 2015)).

We begin by considering whether Grace has been "removed from the home or the physical or legal custody" of Whitney "for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child." Tenn. Code Ann. § 36-1-113(g)(3)(A). In September 2020, DCS filed a petition in the juvenile court alleging that Grace was dependent and neglected. The juvenile court then entered a protective custody order finding probable cause to believe that Grace was dependent and neglected. The court then removed Grace from Whitney's home. When the trial was held in December 2022, more than two years had passed from the time Grace was removed from Whitney's home, which well exceeded the necessary period of six months for this ground. See Tenn. Code Ann. § 36-1-113(g)(3)(B). Therefore, we determine that the requirement of the order of removal has been satisfied for this ground for Whitney as to Grace.

Concerning the order of removal as to Ransom, after DCS filed a petition alleging that he was dependent and neglected, the juvenile court entered a protective custody order in March 2021 finding probable cause to believe that Ransom was dependent and neglected, and the court removed Ransom from Whitney and Ted's home. In March 2022, DCS filed its petition to terminate Whitney's parental rights to the children and Ted's parental rights to Ransom, and the trial was held in December 2022. Thus, more than one year had passed from the time Ransom was removed until the time the trial was held. Accordingly, we conclude that the requisite order existed for this ground for Whitney and Ted as to Ransom.

Furthermore, the conditions that led to the removals of Grace and Ransom have persisted, and they prevent the children's safe return to the parents' care. See Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). Grace was removed due to lack of and/or inappropriate supervision, drug exposure, insufficient housing, and domestic violence. Ransom was removed due to the same circumstances that necessitated the prior removal of Grace. Whitney and Ted remained in the home that was described by Ms. Brown as dirty and hazardous. The drug use has largely persisted, with Whitney having used methamphetamine a month before trial and Ted testing positive for methamphetamine and amphetamine in July 2022. Although there were concerns about domestic violence, Whitney and Ted remained in a relationship and did not attend domestic violence counseling. With these conditions continuing from the time DCS filed the dependency and neglect petitions until the time of trial, it is unlikely that these conditions will be remedied at an early date. See Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii); Dep't of Children's Servs. v. B.B.M., No. E2006-01677-COA-R3-PT, 2007 WL 431251, at *9 (Tenn. Ct. App. Feb. 9, 2007) ("Given that Mother has been unable to remedy these problems for many years, it is unlikely that these conditions would be remedied at any time in the near future."). Likewise, we find that continuing the parent-child relationship would greatly diminish the children's chances of integrating into a safe, stable, and

permanent home. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). We therefore conclude that the ground of persistent conditions existed to terminate Whitney's parental rights to the children and Ted's parental rights to Ransom.

### 4.    Failure to Manifest an Ability and Willingness

We now turn to address the ground of failure to manifest an ability and willingness to assume custody or financial responsibility. This ground exists when:

> A parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). There are two elements necessary to prove for this ground. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

The first element "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Therefore, if the petitioner "seeking to terminate parental rights proves by clear and convincing proof that a parent . . . has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). A parent's ability to assume custody or financial responsibility is evaluated based "on the parent's lifestyle and circumstances." *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020) (citation omitted). As for willingness, it is common for parents to state that they are willing to assume custody or financial responsibility; however, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). Both Whitney and Ted have failed to complete most of the responsibilities in their permanency plans, and they have not paid more than token support for the children. Furthermore, both have continued to use drugs despite efforts by DCS to connect them with providers to remedy these issues. Whitney and Ted's continued failure to complete the actions required for creating a home and family environment that is safe and healthy for the children attests to a lack of ability and willingness to personally assume physical and legal custody or financial responsibility for the children.

The second element requires the petitioner to prove by clear and convincing evidence that placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *In re Neveah M.*, 614 S.W.3d at 677 (quoting Tenn. Code Ann. § 36-1-113(g)(14)). We have described

- 15 -

this element as follows:

> "[T]he use of the modifier 'substantial' indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not."

*In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021). Further, "parents with a significant, recent history of substance abuse . . . could lead to a conclusion of a risk of substantial harm." *Id.*

The continued drug use by Whitney and Ted leads us to conclude that placing the children in their custody would pose a risk of substantial harm to the welfare of the children. Despite her children being removed from her home, Whitney continued to use drugs, even during pregnancy. Ted likewise continued to use drugs during the pendency of this case. Furthermore, Whitney and Ted's home was not in a substantially better position in March 2022 than it was at the time of removal of the children. Therefore, the record supports the findings of the trial court, and the court correctly determined that the failure of Whitney and Ted to manifest an ability and willingness to assume custody or financial responsibility was a proper ground for termination of their parental rights.

### B. Putative Father Grounds for Termination

The trial court also found each of the five enumerated subsections of ground (g)(9) applicable in this case. Tennessee Code Annotated section 36-1-113(g)(9) provides additional grounds for termination for "any person, who, at the time of the filing of a petition to terminate the parental rights of such person, . . . is the putative father of the child." A putative father is defined as:

> [A] biological or alleged biological father of a child who, at the time of the filing of the petition to terminate the parental rights of such person . . . , meets at least one (1) of the criteria set out in § 36-1-117(c), has not been excluded by DNA testing as described in § 24-7-112 establishing that he is not the child's biological father . . . and is not a legal parent.

Tenn. Code Ann. § 36-1-102(44). A "legal parent" is defined as:

> (i) The biological mother of a child;
>
> (ii) A man who is or has been married to the biological mother of the child if the child was born during the marriage or within three hundred (300) days

- 16 -

after the marriage was terminated for any reason, or if the child was born after a decree of separation was entered by a court;

(iii) A man who attempted to marry the biological mother of the child before the child's birth by a marriage apparently in compliance with the law, even if the marriage is declared invalid, if the child was born during the attempted marriage or within three hundred (300) days after the termination of the attempted marriage for any reason;

(iv) A man who has been adjudicated to be the legal father of the child by any court or administrative body of this state or any other state or territory or foreign country or who has signed, pursuant to § 24-7-113, § 68-3-203(g), § 68-3-302, or § 68-3-305(b), an unrevoked and sworn acknowledgment of paternity under Tennessee law, or who has signed such a sworn acknowledgment pursuant to the law of any other state, territory, or foreign country; or

(v) An adoptive parent of a child or adult; . . .

Tenn. Code Ann. § 36-1-102(29). The trial court found that Ted is not the legal parent of Ransom and that he is the putative father. Ted does not meet any of the aforementioned statutory definitions for a legal parent. Furthermore, Ted meets the criteria set out in Tennessee Code Annotated section 36-1-117(c)(2), which provides:

(2) The biological father has claimed to the child's biological mother, or to the petitioners or their attorney, or to the department, a licensed child-placing agency, or a licensed clinical social worker who or that is involved in the care, placement, supervision, or study of the child that the biological father believes that the biological father is the father of the child[.]

Therefore, we conclude that the trial court correctly determined that Ted is the putative father of Ransom.

After finding that Ted was the putative father of Ransom, the trial court found that Ted failed to support Ransom even though he was able-bodied and capable of working to support the child and that there was no good cause or excuse for Ted's failure to make reasonable and consistent payments for the support of Ransom in accordance with the child support guidelines. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(i) ("The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101."). It also found that Ted had not sought reasonable visitation with Ransom and had only engaged in token visitation. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(ii) ("The person has failed to seek reasonable visitation with the child,

and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102."). It also found that Ted failed to manifest a willingness and ability to assume custody of Ransom based upon his continued use and abuse of methamphetamine, substantial noncompliance with his statements of responsibilities in the permanency plans, failure to engage in anything other than token visitation, and failure to pay any support for Ransom in foster care. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(iii) ("The person has failed to manifest an ability and willingness to assume legal and physical custody of the child."). The trial court further found that placing Ransom in Ted's custody would pose a risk of substantial harm to the child's welfare. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv) ("Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child."). The trial court also found that Ted failed to establish parentage by failing to file a petition to legitimate Ransom within thirty days after notice of alleged paternity. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(v) ("The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3)."). The record clearly and convincingly supports each of the trial court's findings and conclusions as to these grounds.

## C.    *Best Interest of the Child*

We now turn to address whether the trial court erred in finding that it was in the best interest of the children to terminate Whitney's parental rights and that it was in the best interest of Ransom to terminate Ted's parental rights. The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).
>
> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best

- 18 -

interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).[6] The twenty statutory best-interests factors are:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household

---

[6] Although the prior version of the best interest factors was in effect in *In re Gabriella D.*, we have recently stated that "we believe the Tennessee Supreme Court's analysis applies to the amended version of Tenn. Code Ann. § 36-1-113(i), as well." *In re Skylith F.*, No. M2022-01231-COA-R3-PT, 2023 WL 6546538, *19 n.7 (Tenn. Ct. App. Oct. 9, 2023).

trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to

creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1)(A)-(T). "When considering the factors [above], the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2). The trial court found that all of these factors except for factor (I) weighed in favor of termination.

Because evaluation of these factors often involves discussion of similar issues, we combine our discussion of these factors "based on the overarching themes within the list of twenty factors." *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023). We begin by addressing the interrelated factors concerning the children's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning a child's need for stability), (B) (concerning how a change in caretaker would affect a child's wellbeing), (D) (concerning the attachment between the parent and child), (E) (concerning visitation between parent and child), (H) (concerning the child's parental attachment with individuals other than the parent), and (T) (concerning the effect of the parent's fitness on the child). The children are in a stable home and are happy and healthy. They are currently receiving adequate medical care, and their needs are taken care of. They have developed a strong attachment with their foster parents to the point they cry and hold onto their foster parents when Ms. Brown goes to take them to visitation. The foster mother also reported that Grace is normally a well-behaved and loving child, but she becomes disruptive after visitation. The children need stability in a loving and secure home, and they have found it with their foster parents and apart from Whitney and Ted. Therefore, these factors weigh in favor of termination.

Next, we address the factors concerning the physical environment of the child and the parent. *See* Tenn. Code Ann. § 36-1-113(i)(1)(F) (concerning whether the child is fearful of living in the parent's home), (G) (concerning whether being in the parent's home triggers the child's trauma), (N) (concerning abuse or neglect in the parent's home), (O) (concerning whether the parent has provided safe and stable care to any child in the past), (Q) (concerning the parent's commitment to maintaining a home that meets the child's needs), and (R) (concerning the health and safety of the parent's home). Ms. Brown

- 21 -

testified that the children would be fearful of living with Whitney and Ted because they are essentially strangers to the children. Likewise, Whitney and Ted's continued drug use could cause the children to experience traumatic symptoms in their home. Both Whitney and Ted's history of parenting reveal that similar concerns arose concerning the care of their other children. Whitney does not have custody of her three oldest children, and her visitation with them is supervised. Ted's parental rights were terminated with respect to two of his other children. Whitney and Ted also do not have custody of their youngest child, who was born drug exposed in May 2022. The trial court also found that their youngest child was a victim of severe child abuse perpetrated by Whitney and Ted. Thus, these facts lead to the conclusion that Whitney and Ted have not maintained a physical environment in their home that is healthy and safe for the children or that meets their needs. Therefore, we conclude that these factors weigh in favor of termination.

We now turn to consider the factors pertaining to the efforts made by the parents. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (concerning the parent's demonstration of continuity and stability in meeting the child's needs), (J) (concerning the parent's lasting adjustment of circumstances), (K) (concerning the parent's use of available programs, services, or community resources), (L) (concerning DCS's efforts), (M) (concerning parent's sense of urgency), and (P) (concerning the parent's understanding of the child's needs). Despite DCS's extensive efforts to connect them with resources, Whitney and Ted have continued to use drugs, have continued to stay in an unsanitary and unsafe home, and have not completed most of their permanency plan responsibilities. Likewise, although DCS has often provided them with offers of assistance of transportation, they have not taken advantage of these opportunities to attend visitation and strengthen their bond with the children. Their failures to pay support, visit, and follow any permanency plan responsibilities further evince a lack of understanding as to the children's needs. We therefore find that these factors weigh in favor of termination.

Next, we address factor (S), which concerns whether the parents have paid more than token financial support. As we previously discussed in our analysis of the ground of abandonment by failure to support, Whitney has only paid $23.00 toward the support of Grace and has paid no money to the support of Ransom. Likewise, Ted has paid no money for the support of Ransom. Although we recognize that Whitney and Ted have provided other items for the children, this support is token when compared to the monetary support ordered by the trial court. Therefore, we conclude that factor (S) weighs in favor of termination.

Finally, we address factor (I), which pertains to the child's relationship with others. Ms. Brown and the foster mother both testified that the children are well-bonded with each other. Ms. Brown further testified that the termination of parental rights will not negatively impact the "children's heritage about one another" because the children will be adopted by the same foster parents. Therefore, we conclude that this factor weighs in favor of termination.

After reviewing all of these statutory factors, we find clear and convincing evidence that it is in the children's best interest for parental rights to be terminated so that the children can find a permanent secure and loving home. *See In re L.S.W.*, No. M2000-01935-COA-R3-JV, 2001 WL 1013079, at *8 (Tenn. Ct. App. Sept. 6, 2001) ("To do other than affirm the termination of parental rights would leave these children 'in limbo' indefinitely, and we cannot agree that long-term foster care is in the children's best interest."). Therefore, the trial court did not err in finding that the termination was in the children's best interest.

## V. CONCLUSION

For the aforementioned reasons, we reverse the termination of the parental rights of Whitney F. for failure to establish a suitable home and the termination of the parental rights of Ted H. for abandonment by failure to support, failure to visit, and failure to establish a suitable home. Otherwise we affirm the trial court's order terminating the parental rights of both Whitney F. and Ted H. We remand for further proceedings consistent with this opinion.

Costs of this appeal are taxed to the appellants, Whitney F. and Ted H., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE